UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | Case No.: Cr. No. 21-120 |
| | : | |
| JAMES WARD JACKSON | : | |

## MEMORANDUM IN SUPPORT OF MOTION TO RECONSIDER DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant, James W. Jackson, by and through counsel, hereby submits this memorandum of law in support of his Motion to Reconsider Defendant's Motion to Suppress Evidence. Mr. Jackson is charged with distributing child pornography in violation of 18 U.S.C. § 2252(a)(2), and possessing and accessing with intent to view child pornography in violation of 18 U.S.C. § 2252 (a)(4)(B). Defendant's Motion to Suppress Evidence was denied by the Court on November 14, 2022. At page 10 of its decision, the Court wrote:

> The limitations of the record in the present case make difficult the determination of which of the preceding paradigms [single-family dwellings as opposed to multi-unit dwellings] is applicable here. Both parties and the search warrant itself refer to the fact that multiple people live and work within the rectory and that it contains storage areas…. The affidavit accompanying the Complaint notes that Defendant had a bedroom and an adjoining office and references a "dining room/common area."….A more detailed description of the building, however, is not provided. From these descriptions, it seems that the rectory does not possess the hallmarks of multi-unit dwellings such as a separate entrance, separate doorbell or mailboxes, and independent living space, and would be best characterized as a single-family residence, making the description in the warrant sufficiently particular, but this cannot be conclusively determine based on the available information.

Defendant's motion to suppress relied upon facts established by the search warrant, which stated that the name of the owner or keeper of the property to be searched was "unknown," and that the search was to include "spaces located on the

1

premises used by residents." Since, as recognized by the warrant, the church rectory contained more than one "resident," Defendant argued that the particularity clause with regard to the place to be searched, as well as items to be seized, was not met on the face of the warrant. Defendant now provides additional information regarding the occupancy and configuration of the premises searched for the Court's reconsideration.

## I. FACTS

St. Mary's Catholic Church is a large church, dating to 1853, with the current church building having been completed in 1869. (Ex. A). In addition to some history of the church, its website, *stmarypvdri.org*, contains information about the church schedule, including masses, confessions, and other information. It also has copies of the weekly church bulletin, indicating that multiple priests are assigned there. St. Mary's has two masses a day and three on both Sundays and holy days. The church is open to the public daily, locked only after the evening mass or other events. Copies of the weekly bulletin are also available inside the church. The bulletin lists some of the priests who serve the church; two are listed in a recent bulletin. (Ex. B). A Deacon who currently lives in the rectory is not listed in the bulletin.

Next to the church is the rectory—a three-story yellow large house, which also has a basement. The rectory (Ex. C) contains church offices, including the office of the church administrator. The rectory is also the home of priests who serve the church. There are three priest residences within the rectory. Each has a bedroom, an office, and a living area. The pastor's residence is a bit larger than the others, as it has a private bathroom, whereas the associate residents share a bathroom. There are two entrances to the rectory, one in the front (Ex. D and the other in the rear (Ex. E). There is parking along the side of the rectory for priests, employees, and visitors (Ex. F). The church and the rectory both share the address of 538

Broadway, Providence, RI. Mail is delivered to a single location for all that live and work there. Affidavits of the two priests currently assigned to St. Mary's and who presently reside in the rectory are attached (Ex. G – Affidavits of Reverends Truong and Romanoski).

The first floor of the rectory contains common areas. When you enter the rear entrance, there is a hall which runs toward the front of the house (Ex. H), which turns to the left at the end and then back to the right to the front entrance (Ex. I, from front to rear). From the rear entrance, there is a communal kitchen to the left (Ex. J) and an office for administrator of the church to the right (Ex. K). Down the hall, where it zigs to the left, there is a door to the right that enters the dining area (Ex. L shows the dining room looking to front living room, while Ex. M1063] shows the living room looking to the dining room). The living room is at the front of the house (Ex. N and Ex. O looking from living room into dining room). The living and dining rooms are also used as meeting areas. Across the hall from the living room is an office for a priest (Ex. P). Going back up the hall toward the rear, after passing the staircase to the second floor on the left (Ex. I), there is another office for a priest to the right (Ex. Q).

The second private floor houses the residents of the building. From the rear going forward, on the right is a shared living area (Ex. R). Next up the hall on the right is the entrance to the Pastor's suite. You enter into the work area for the Pastor (Ex. S and T). The work area leads into the Pastor's bedroom (Ex. U) and his bathroom (Ex. V). Looking down the hall to the front of the house, you can see a workspace at the end (Ex. W). If you go to the front where the workspace is located and look toward the back of the house, the staircase leads up to the third floor, which is used for storage (Ex. X). Going toward the back of the house, there is residence

for a priest (Ex. Y), followed by another residence for a priest (Ex. Z., At the rear on the side of the priests' bedrooms, there is a bathroom that the associate priests share.[1]

## II. ARGUMENT

**THE ADDITIONAL FACTS PROVIDED HEREIN ESTABLISH THAT THE SEARCH WARRANT VIOLATED THE PARTICULARITY CLAUSE OF THE FOURTH AMENDMENT, MAKING THE SEARCH EXECUTED UNDER ITS AUTHORITY A GENERAL SEARCH PROHIBITED BY THAT AMENDMENT.**

A. **Particularity**

The applicable law was examined in Defendant's Motion to Suppress and will not be covered thoroughly again in this Motion to Reconsider. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), explained:

> The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

If the place to be searched or the thing to be seized is not described as commanded by the Constitutional requirement, "[t]he uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988, n. 5 (1984) (citing a number of cases including *United States v. Klein*, 565 F.2d 183, 185 (1st Cir. 1977).

This Motion to Reconsider is based on facts missing in the original Motion to Suppress. The expanded facts, covered herein, are relied on.

---

[1] There is no photograph of this bathroom because it was occupied at the time of the visit.

Priests are not roommates. While they may share some parts of the rectory with each other, church employees, and others such as visitors and parishioners, they have their own private living areas. The first floor of the rectory was shared with others, e.g., a common kitchen and dining room, rooms for meetings, and an office for the administrator. The second floor was reserved for the residents and included living and working areas for three priests, e.g., each priest in residence had a bedroom, an office area for working, and a bathroom, although one bathroom was shared by two associate priests whereas the pastor's residence as its own private bathroom. The third floor of the rectory is and was used for storage.

The police officers in this case knew there were more than one resident priest in the rectory (the search warrant refers to "residents"), but they did not narrow the search to any occupant (the target of the search was listed as "unknown"). *Garrison,* 480 U.S. at 85 ("Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant.") Indeed, the size of the church and the rectory, the church website, and weekly bulletin readily supported the existence of multiple residents. Officers certainly were aware of multiple residents, at the very least when they ascended to the second floor during execution of the warrant. Notwithstanding, they did not stop the search, see *Garrison*, 480 U.S. at 87-88 and at n. 13, p. 88. Rather, they continued searching for every sort of electronic or digital device allowed by the broadly worded warrant, including phones, computers, and any other digital or electronic device that could store information.

Priests are entitled to privacy like other citizens; indeed, perhaps their calling and service provide less privacy in some ways—they do not live in private houses

with locked community gates, locked houses, or even locked apartments. Indeed, the circumstances of their daily life likely make privacy of heightened importance. The living situation of priests is akin to rooming houses where tenants share some areas, such as kitchens, dining, or even living areas, but have their own private bedrooms or living spaces. Less expensive accommodations do not diminish the constitutionally protected privacy of the individual. See *United States v. Hinton,* 219 F.2d 324, 325 (7th Cir. 1955) ("Federal courts have consistently held that the Fourth Amendment's requirement that a specific 'place' be described when applied to dwellings refers to a single living unit (the residence of one person or family). Thus, a warrant which describes an entire building when cause is shown for searching only one area is void. [Citing cases.]")

  Rather than try to narrow the search, the government argued that it had probable cause for the entire area serviced by the internet (the church and the rectory), permitting officers to search multiple living areas because they had not narrowed their investigation to a particular individual. See *United States v. Higgins*, 428 F.2d 232 (7th Cir. 1970), as an example of a case where such an argument was unsuccessfully made. In Mr. Jackson's case, such an argument is the equivalent of arguing that police who know that alleged child pornography files were downloaded to one of many devices using a single internet service for an entire apartment building can search every apartment in the building because they did not know which residence the suspect occupied when downloading the suspect files. Expediency does not negate the constitutional particularity requirement. Probable cause is required for the particular place to be searched and the things to be seized. The breadth of the search allowed by the warrant, both as to the multiple residences to be searched and entirety of the items to be seized (belonging to

different residents) for the purpose of thereafter searching them over a period of time (digital forensic analysis) anticipated to be several months, treats the particularity clause as a constitutional necessity that can be disposed of based on expediency.

Moreover, if the common living situation of priests residing in rectories makes them easier prey for police with less of a showing of probable cause related to the particular search to be undertaken, then the freedom of religion clause of the First Amendment, as well as freedom of speech, may also be implicated. As pointed out in the Court's decision at pages 13-14, courts have been increasing the constitutional regulation of searches for electronic evidence, providing additional safeguards, e.g., wiretapping statutes and cases, and cases restricting the use of cellphone site location and GPS information. The result of the decision here is a divergence from this trend, allowing evidence seized from many electronic devices located in several private residences, in violation of the particularity clause requiring a showing of probable cause for the residence of each priest living within the multi resident rectory building.

Is it too much, when faced with a search of multiple residences, to require additional investigation by police to narrow the search? Does it require too much to ask the police to question the suspects or potentially knowledgeable persons attached to the premises before applying for and/or executing a warrant? Could they not have simply sought the seizure of the router for the internet, which has a log showing the times that particular devices are attached to the internet. After all, investigators in this case had several dates and times of alleged child pornography viewing.

    B.  **<u>Good Faith</u>**

As for good faith, in *United States v. Leon*, 468 U.S. 897, 922-925 (1984), the Court pointed out that exclusion of evidence remains appropriate in several situations where an officer

may not rely on the magistrate's determination of probable cause. One of the exceptions to application of the "objective good faith" rule was explained in *Leon,* 468 U.S. at 923: "[A] warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts v. Sheppard, post*, at 988-981." That exception was recognized again by the Court in *Groh*, 540 U.S at 561, n. 4. The enormous breadth and scope of the listed "place to be searched" and the "items to be seized" violated the particularity clause as shown above, making the warrant in this case facially deficient.

  The second applicable exception mentioned in *Leon, supra*, is as follows:

> Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S. [590, 606], at 610-611 [(1975)] (Powell, J., concurring in part); see *Illinois v. Gates,* [462 U.S. 213, 246], at 263-264 [(1983)] (White, J., concurring in judgment).

  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), explained that the purpose of the particularity requirement was to limit the authorization to search to the specific areas and things for which there is probable cause to believe evidence of a crime will be located. The search in Mr. Jackson's case was for every conceivable electronic device that might be found in multiple buildings, including a church open to the public, the church offices of employees, and the residences of several priests, without narrowing down the owner or keeper of the information, or the device used. Moreover, the government proposed to seize all items listed on their lengthy generic list and take "weeks or months" to have experts search through the materials seized for evidence of "child pornography." The fact that an internet address serviced the buildings did not provide an objectively reasonable belief that probable cause existed for such an exhaustive

search of multiple residences and devices without any attempt to narrow down, or "particularly describe" the place to be searched and the items to be seized.

### III. CONCLUSION

For the reasons set forth herein, Mr. Jackson requests that the Court grant the motion to reconsider based on the additional information supplied by this motion, and suppress the evidence obtained during the search and seizure that violated the particularity clause of the Fourth Amendment, as well as the fruits of that illegality, namely the later seizure of the Mr. Jackson's electronic device(s).

Respectfully submitted this 2nd day of February, 2023.

/s/ John L. Calcagni III, Esq
John L. Calcagni III (Bar No.: 6809)
Law Office of John L. Calcagni III, Inc.
72 Clifford Street, Suite 300
Providence, RI  02903
Phone: 401-351-5100
Fax: 401-351-5101
jc@calcagnilaw.com

## CERTIFICATION

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered Participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on February 2, 2023.

/s/ John L. Calcagni III, Esq
John L. Calcagni III (Bar No.: 6809)
Law Office of John L. Calcagni III, Inc.
72 Clifford Street, Suite 300
Providence, RI  02903
Phone: 401-351-5100
Fax: 401-351-5101
jc@calcagnilaw.com