ATTACHMENT B

1



AUG 0 7 2023

# OUR LADY
## OF CLEAR CREEK ABBEY

July 31, 2023

### TO WHOM IT MAY CONCERN:

### Statement of Support on Behalf of James W. Jackson by Philip Watson Anderson

My name is Philip Watson Anderson, and I am a long-time friend of James. I understand that he recently pleaded guilty to certain offenses in U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

I am and have been a Catholic priest for 39 years and a Benedictine monk for 47 years. At present I am the abbot, that is to say the religious Superior of a community (an abbey) of 60 monks located in northeastern Oklahoma, about an hour's drive from Tulsa. The name is Our Lady of Clear Creek Abbey. I grew up in Prairie Village, Kansas and attended public schools including Shawnee Mission East High School. After graduating from High School, I attended the University of Kansas for two years, from the fall of 1971 to the spring of 1973 without graduating, but with the intention to complete my degree. I interrupted my university studies to serve in the United States Marine Corps from 1973 to 1975, during the Vietnam conflict, spending one year on the island of Okinawa. In those days one could sign up for an enlistment of only two years, which I did, and was honorably discharged, having earned the rank of corporal. Instead of returning to the University of Kansas, I went to France, along with other young Catholic friends, to enter an ancient Benedictine monastery there, Notre-Dame de Fontgombault Abbey. As a monk, I received a Bachelor's Degree in Theology. I have taught Music, Philosophy, and Theology in the monastery and have published an essay[1] in a book concerning liturgy, having another article to be published soon. The hope we Americans entertained upon entering the French monastery, was to receive a formation there and then return to the United States, something

---

[1] Alcuin Reid, *Liturgy in the Twenty-First Century* (London: Bloomsbury 2016) pp. 342-359.

5804 West Monastery Road          Hulbert, Oklahoma 74441-5698          www.clearcreekmonks.org

that did, indeed, happen in 1999, after some twenty-five years in France. The Catholic bishop of that time, Edward J. Slattery, heard of our group and invited us to settle in his diocese. We are still hear some twenty-three years later, the community having grown from 13 to 60. James was never a monk, but he belonged to the group of people termed "secular Oblates," who share in the life of the monastery from their positions in the world.

It was in the abbey of Fontgombault in France that I first met James Jackson, in 1976. At the time James Jackson was in his "year abroad" program from the University of Kansas. They were staying in Ireland, but made a side trip to Fontgombault abbey, where I was preparing to enter as a monk. He participated in the same Humanities Program at the University of Kansas as I did earlier, before James came to K.U. James Jackson was not Catholic as the time we met at Fontbombault, but was impressed by the monastery. He later became a Catholic and then a priest. At one point, I think it was during the First Gulf War, he volunteered to go to Iraq as chaplain, and did so, parachuting into the area, where he was to serve. That sort of thing pleased him a great deal. I have known him as a diocesan Priest for the Diocese of Wichita, then as a member of the Priestly Fraternity of Saint Peter (priestly society), where he served as Pastor in many places, before becoming the Director of their seminary in Denton, Nebraska. In more recent times, he was again a Pastor at a parish in Denver, before going to Rhode Island. He often stopped by at the abbey where I am in Oklahoma, and we spoke of many things.

He always impressed me as a man, not only of integrity, but of exceptional virtue and talent. He is well read, has always given himself for the good of others, whether they be Catholic, Protestants, or non-believers. He has been very attentive to the needs of poor people—especially as a Parish Priest. A few years ago, James developed a benign brain tumor, which has caused migraine headaches and such. I think the doctors cannot remove the tumor, but were able to do something to relieve somewhat the pressure. I have admired his self-denial in this matter as well, as he never complains about the tumor. Of course, all of this seems to contrast greatly with the abominable crime of child pornography, but I just bear witness to the James Jackson I have known. Never did I see even the slightest hint that he would be delving into the dark world of porn.

3

James has shown a great willingness to help others in any situation. I am told he is well-respected by most of the prisoners around him in his current place of incarceration. He has written to me in a letter that he started a campaign to get his fellow prisoners to stop blaspheming, this without preaching to them, but just as a trusted counselor. They call him "Mr. Jim." I believe that James can still be of great help to society and that the court would be doing a truly good deed in favor of the common good to use leniency in sentencing him. I would be happy to answer any questions or be of service, if that were useful. Thank you for your kind consideration.

+Abbot Philip Anderson

+ br. Philp Anderson, abbot

Our Lady of Clear Creek Abbey
Hulbert, Oklahoma 74441
918 772 2454

Letter in Support of James Jackson

December 10, 2023

To the court:

I am a software engineer in Denver, Colorado. I am the father of 8 children, 4 boys and 4 girls, and I am a parishioner at Our Lady of Mount Carmel in Littleton Colorado. I have known Fr. Jackson for his entire time there. I have spent much time with him at parish events, as well as speaking to him personally many times, both informally and seeking his advice, had him at our home for meals, and spent time with him in recreational activities, including hiking, ultimate frisbee, and altar boy camp. He taught and administered many Sacraments to our children.

He has shown himself to be compassionate, intelligent, patient, humble, and trustworthy. He has always shown a willingness to give his time to anyone who approached him. Countless members of our parish counted on him for advice and spiritual comfort, which he brought to many. I observed him in public as well, taking time to speak kindly to any who approached him. He also had a good sense of humor and was an excellent storyteller. I always felt that he was a good man and a good priest who gave much.

My children are all fond of Fr. Jackson and appreciate the kind leadership he has shown to them and all the parish. One of my daughters recounted a story from many years ago when she about 6 years old that showed his patience and caring for children. When he was doing outside work on the church property one day, she decided to talk to him about some important matters. She followed him around for about an hour as he worked, talking non-stop about her troubles and some pink sunglasses she really wanted. He listened patiently as he worked, responding enough to show he was listening, and reassuring her that things would work out for the best. My 8 children have only had positive experiences with him growing up.

His willingness to sacrifice for others that I have observed many times was shown in how he handled a situation in which someone close to me was leading a youth education program at the parish. Two parents who didn't like some of her decisions began publicly attacking her personally and viciously. Fr. Jackson then drew their ire towards himself. Although that ire was unjust, he did not defend himself but instead allowed it to continue for some time, which I could see was to give my family member some relief. On another occasion, he came late at night to visit and assist us when one of my children was being treated at a hospital.

While he radiated strength and benevolence as the pastor, he was also meek in the good sense of the word. He seemed to think well of others, taking advice or criticism seriously and often implementing suggestions. The only issue I noticed with Fr. Jackson was that his memory seemed to be failing the last couple of years he was in Colorado. He would sometimes start the wrong prayer and then correct himself, or forget an appointment. I don't know the cause of this, but thought it might be the tumor he had been diagnosed with in his head that had caused some hearing issues.

Being a priest meant everything to him, and I am sure that losing the ability to function in that office will be a great suffering for him. I respectfully request that the sentence given to him not be one to crush him but allow him to prayerfully recover from this and return to the life of sacrificial service that he has chosen and God has granted to him. We are praying for him and I am sure that he is praying for all that have been affected by this.

Thank you for considering my support of James Jackson.

John Baker

September 18, 2023

Re: **Statement of Support on Behalf of James W. Jackson by Scott J. Bloch**

My name is Scott J. Bloch. I have been an attorney for over 37 years. I have served in government as a senate-confirmed head of a small enforcement agency, the United States Office of Special Counsel, and before that for the Deputy Attorney General in the United States Department of Justice for two years. For fifteen years I was a partner in a respected Midwestern law firm, and also on the Kansas Board of Discipline. I am admitted in the District of Columbia, California, and Kansas, and in the District of Columbia Federal district court and Court of Appeals, Kansas federal court, and the United States Supreme Court. My practice for the last 15 years consists of complex litigation, and a specialty in representing overseas contractors in contract and personal injury matters all over the country and the world. I also volunteer for and support monetarily various charities. I am a Knight of Malta and volunteer with challenged and special needs individuals, write to prisoners in the Malta Pen Pal program, and I am also Vice Chair of the Board of Trustees of Thomas More College of the Liberal Arts in Merrimack, New Hampshire. I served on the founding board of another liberal arts college, and I have been involved in various non-profit educational ventures for the last 35 years. I am author of two books, one on the writings of a British historian and essayist, and one a novel, published last year, focusing on the coming of age journey of a young man who discovers himself through the study of the great books in a humanities program.

I have known Jim (as I have known James Jackson) for over forty years. We first met in college. We were both students in an innovative core humanities course. For the first five or six years, I knew him only as an acquaintance I would see at parties or picnics, or reunions. I knew he was attending seminary. He and I were sympatico due to our shared sense of humor and intellectual pursuits. At one point, I taught over 100 teenagers in a class preparing them for confirmation at St. Paul's Catholic Church in Olathe, Kansas. Jim was then a Catholic priest of the Wichita Diocese. He came up to Olathe at the request of Fr. Don Cullen, the pastor at St. Paul's, to help teach that course. I was teaching it weekly with two other friends. Jim supported us in our endeavor to teach and inspire these young people in their march toward confirmation. It was a successful class -- that is, we sensed that the young people enjoyed it, were engaged, and perhaps even inspired -- and that was due in large part to the charisma and kindness of Fr. Jim Jackson. For those of us who were friends of his, he embodied some of the finest qualities of a priest: deep humanity, kindness, wit, and integrity. He made being a good and faithful Catholic seem more credible and desirable.

This never changed over the forty plus years I have known him. I would see him from time to time at gatherings where I caught up with what he was doing. For example, I would attend events in Wichita where he would be, and learned of how his priesthood was going there. At one point, I learned he was going to join the Priestly Fraternity of St. Peter, an ecclesiastical organization with the Roman Catholic Church dedicated to saying the Latin mass. I knew some people who were in that organization, so it was not a great surprise that Jim wanted to more deeply practice his faith and priesthood within that tradition. I also knew that at one point he became a Chaplain and served as such in Iraq during Operation Desert Storm. I had a friend in the Marines from

1

Wichita who served in Operation Desert Storm and reported back to me seeing Jim in Kuwait during that time and reflected to me how good a priest he was and how important he was to the support of the troops on the front line of that operation.

At some point, I learned that Jim had been named as the head of vocations at Our Lady of Guadalupe seminary in Nebraska for the Fraternity of St. Peter. That did not surprise me given that – based on my observations over the years – he exuded the most humanity and charity of the priests of that order I had met. Some of them could be a little severe or unapproachable. Jim was never that way, and I thought it was a good move of the Seminary to put him in that position. He also became the chaplain of a boarding school to which I sent three of my boys at various times from 2001 to 2008, and then again, 2016-2019. He and I knew the founder of that boarding school as a common friend, so this too became another way in which I reconnected with Jim. This was in Pennsylvania. I also went to a wedding of the son of a common friend of ours at which Jim presided and was a tremendous presence at that event.

Jim and I were keynote speakers at a Symposium on John Senior at the Clear Creek Abbey in Oklahoma in 2010. This was a whole weekend of events, lectures, and opportunities for catching up with Jim and delighting in his stories. There was a reunion of our humanities program where I saw Jim again. This could have been in 2007 or later. I was the emcee of the event, and Jim had written a book on the Latin mass. I recall that being a joyful reunion where he was a big part of the event.

A couple of years ago we had a reunion where we were dedicating a monument to our three former professors of the humanities program. Again, I was on the committee involved in fundraising and unveiling that. Jim was a part of that and was convivial, and as I recall his presence was encouraging to others. I heard a couple of years ago that Jim was being transferred to Rhode Island as a pastor of a Fraternity parish.

My observations about Jim based on all of my interactions with him, as an acquaintance, friend, fellow panel member, and engagement with him in educating young people, as well as in his role in charge of young people are this: Jim always embodied the highest ideals of integrity, character, concern for others, efforts to reach out to others, being a good example, offering personal insights, telling engaging stories of people, kindness towards others, and modeling of virtues that he preached. I met a lot of people in law and government whose use of words exceeded their ability to embody what they were saying. This was not so with Jim – as I knew him in all of these interactions. He did not have any kind of reputation or history of hypocrisy or not following his own advice. He was highly intelligent and solicitous of others to come to understand truths he spoke about. I never detected in him any hint of duplicity or not making eye contact or any of the other evidence one could point of someone who leads a double life. I do have friends or acquaintances who do give signs of having some issues of duplicity, or having a dark side that sometimes comes out fairly strikingly. This was never the case with Jim. One could say, maybe he was just better at concealing who he was. I would have to accept that that could be true; but then one would expect for there to be some reputational issues in his parishes, among his friends and fellow students, among those who taught with him, some indicator that in hindsight one has to say, I didn't really pay attention to that. But I've not encountered any of that, and in discussions since his very public arrest, nobody has indicated such.

2

The only criticism I've ever heard of about Jim was from friends who worked with him who said that he was a little too generous with others and didn't have great judgment in who to offer jobs to, and who to pass on.

Jim showed persistence in fulfilling goals and showed that he knew how to work hard, sacrifice for others, and to continue his studies after college and seminary. He is a sharp analytical thinker who can cut to the heart of any issue with insight and humor. In my own discussions with him, he has impressed me with his ideas and the eloquence with which he argues them. Jim is also a good man for whom ethics and morals, loyalty and duty are an important way of life.

Obviously, something went wrong somewhere along the line for these charges and plea to be taking place. I have been corresponding with Jim since he was imprisoned. In my correspondence with Jim I have been struck by his desire to help others in the detention center, including trying to use less profanity and teaching Spanish. I think he has learned from his mistakes and behavior that is beneath his years of being a priest and man of high integrity. He has shown great remorse that he expressed to me due to letting himself be corrupted in this one area of his life. He had made no excuses, and he has stated to me emphatically that he is glad to have this opportunity to serve out a sentence that enables him to improve, be rehabilitated and keep himself from any of that filth or corruption that got a grip on him. He has been honest with me about his circumstances. I truly believe he realizes the wrongfulness of his possession and viewing of that material; and I truly believe he is no danger to anyone now, and that he will pose no danger in the future.

He has asked for books to be sent to him, which I have sent and others have sent. He has been praying for my son who has troubles of his own, and a young daughter who is struggling. In our correspondence, he often asks me about their wellbeing. In short, the tone of his correspondence with me is the Jim I have known all these years. I have picked up on no bitterness or aggressiveness about the system. There is, in spite of the horror of what has happened, a nobility and redeemability about Jim that has really come through to me. He wants to come out of prison able to continue to be of service to society, to help others as he has always done, and to make good on what he has taken from society by breaching this trust. So many looked to him as a role model. I am as shocked as any of my friends about Jim's secret life. But he has made a major contribution to others, and to our society over his years as a chaplain and priest, and his potential to continue to serve society in a positive way is great.

It is for this reason that I ask that you show lenience to Jim for his fall from grace, which I do believe to be serious but also isolated and outweighed by a lifetime of good. Please contact me if I can be of any further service.

Sincerely,

Scott J. Bloch
703-258-4842

3

Sunday, August 20, 2023

AUG 2 5 2023

### Statement In Support on Behalf of James W. Jackson by Kurt L. Carter

My name is Kurt Lee Carter, and I am a friend of James Jackson. I understand that James recently pleaded guilty to certain offenses in U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

I am sixty-four years old. I reside in Garden Plain Kansas, one and one half miles from the highway. I am grateful to share my home with my lovely wife Jean, and our son Elijah. Eli is mentally retarded and will always be a part of the small Carter Family. The large Carter family consists of our oldest daughter Jessica, her husband Ben and their three adopted children, Cameron, Hendrix, and Nadiri. Jessica teaches Special Education and Ben has his own home construction company. Hannah is next in line. She is an artist and lives in the mountains of Pennsylvania, in the town of Jim Thorpe. Eli lives at home, works at the local lumber yard, and participates in far too many Special Olympic events. The youngest is Adalia. She is still trying to figure out her place in line. As she contemplates the queue, she is a nanny and babysitter, and can support herself. (I typed with much relief). I am a Key Account Manager for Walton's, Inc. I have been with the company for twenty-seven very good years and look forward to many more. My lovely wife says two and one half more years; we shall see. I am active in my church, St. Anthony's. I oversee the Adoration Society, serve on the Building and Maintenance Committee, assist with Communion for the home bound, and anything else Father asks me to do. I coach my son's Special Olympics team and assist other coaches with their teams. I volunteer regularly at the Lord's diner and enjoy helping with Habitat for Humanity.

I met Jim Jackson when he was assigned Associate Pastor at Blessed Sacrement parish in 1986. This is the church my lovely wife attended. I went with her every Sunday, but I was not Catholic, only a loving husband. I would talk to James while we waited on the sidelines for pick-up basketball, then at different church functions. As I got to know and trust him, I began to ask him questions about his faith. I learned of his conversion and soon we became friends. Slowly I became aware of my desire to learn more about the Catholic faith, and he helped me through my catechism and my million questions (I did not go easy across the Tiber). Our friendship continued even after we moved away from Blessed Sacrement. I would go to the churches Fr. Jackson was assigned and attend his Mass and he would come out for dinner. Our friendship extended beyond the church, and he was frequently welcomed into my home. He was, and is, a good friend who listened well and helped me through our darker times. I always found him to be extremely faithful to the church and her teachings and trusted that he always led me down the proper paths in my spiritual life. He talked to my children regularly, ate with them, and said Mass with us in our home. I trusted him enough that I took a position at a school in Pennsylvania that he was going to be the rector, St. Gregory's Academy. I moved my family across the United States to work with my friend and to be part of his dream, to start a school for young men. Through no fault of his, the governing body of the school changed, and the new Director wanted to put his own people in place. I moved back to Kansas but kept close contact with James. I travel for my job and whenever I was close, I would visit. When they transferred him to Omaha it was an easy trip to go up and say hello. Fr. Jackson would stay at our house when he was passing through.

He was a fierce defender of what was good in the Catholic church, while seemingly oblivious to what is good for him. James was unwavering in his insistence that a Catholic follow all the precepts of our Holy Mother Church and patiently guided many "lost sheep" back to the fold. He helped me many times to correct some of my less than charitable ideologies and would smile at my idiocies and then correct and quiet me. I know since meeting him, I have become a better man, a better husband and father, and a better servant and friend to those around me. Despite his private darkness, he still was a positive and uplifting presence in the lives of many.

I know James regrets his decisions, everyone does when they are caught. But still he has lost so much more than his dignity, pride and self-respect; he has lost his priesthood. He will still be my friend, but he will never be my priest. He will still hear my complaints, but never my confession. He will be a part of my civic life, but never again a part of the sacramental life of my family. Now that the darkness within him has been revealed and made public, He would have to work harder at renewing trust and friendships. I believe walking among those he failed would be a greater pain than prison.

I ask that you please consider showing leniency towards James. I still believe he is a good person who will still have a positive influence on those around him. I know that there is still in him the man who guided me to a better life. I also ask you selfishly; because no one really knows for certain how much time we have left on this "sad old earth" for myself so that I might share a laugh and song with a man whom I have come to know and love and still count among my dearest friends. I am,

Sincerely yours,

Kurt L. Carter

gppillshome@hotmail.com

## Statement of Support on Behalf of James W. Jackson by John E. Cerkey

### Introduction

My name is John E. Cerkey, a close personal friend of Fr. Jackson's since we first met in the fall of 1978 in an open-air café, in the village surrounded by Lourdes, France. Essentially, we were on personal pilgrimages, but coming from different directions. That pilgrimage led to a life-long friendship of nearly half a century. Furthermore, that friendship is not disturbed in the least, by the utterly false and baseless charges that have been leveled against him. Now, one might assume that since a plea agreement has been reached, that this somehow justifies the presumption of guilt—I will address that issue at the end of this statement. In the meantime, I write to urge the court to be lenient and even consider time served as an appropriate response to the situation.

### Personal Data

Since the information in this paragraph is solicited, I will point out that I am married (40 years, as of February 2024); we have 5 adult children and 10 grandchildren. They are scattered from North Carolina, to Washington, D. C., to North Las Vegas. My wife and I reside in Lexington, Virginia where I serve as a professor, teaching at one of the two small colleges in this community; currently I am entering my 31st year teaching. I grew up in Kansas City, Kansas, and eventually completed my Ph.D. at the University of Kansas. Our oldest granddaughter just graduated from Washington Charter Latin Grammar School (D. C.) and is now attending USC (Los Angeles) as a freshman.

### Personal Knowledge & Brief History of a Long Friendship

Jim Jackson and I met in Lourdes, France. We both spent time (but at different times) trying to discern a vocation to the Benedictine life at Notre Dame de Fontgombault, geolocated on the Creuse River in the Loire Valley, France. Eventually, we both joined the Wichita, Kansas Diocese as seminarians. We studied philosophy together at St. Pius X, Erlanger, Kentucky, under the tutelage of outstanding faculty from differing religious orders. From there, we attended Mt. St. Mary's in Emmitsburg, Maryland. After a few years, I left the seminary and got married. On the other hand, Fr. Jackson and other mutual friends were ordained to the priesthood on May 18, 1985—one of them is now a Catholic Bishop, and another from an earlier class, is an Archbishop. Before he was ordained, Jim was the best man at my wedding. In the summer of 1984, he baptized our oldest daughter. We have been best friends for a virtual lifetime and have stayed in touch throughout all these years via correspondence or visits, as our vocations and locations have permitted. From that point forward, Fr. Jackson served the Wichita Diocese faithfully; entered the Navy Chaplaincy during the Persian Gulf War where he served with distinction; was honorably discharged; joined the Fraternity of St. Peter (F. S. S. P.) with the permission of the Bishop of Wichita; transformed a broken down inner-city parish in Tulsa, Oklahoma; became Rector for several years of the School of Major Theology for the Fraternity, in Denton, Nebraska (just outside Lincoln); and was assigned to Our Lady of Mt. Carmel Catholic Church in Littleton, Colorado, where he served for many years. He published an outstanding work explaining the beauty and mystery of the Traditional Latin Mass, *Nothing Superfluous* (2016). He has lifted up the lowly, converted many a soul, been spiritual director to thousands, has been a friend and spiritual guide to Bishops, Archbishops, monks, Abbots and

Abbesses, as well as retreat master for cloistered nuns. He has also been a constant comforter to the afflicted.

Ask Mrs. Leah Talley, whose husband, Officer Talley was tragically murdered in the line of duty at a supermarket in Boulder, Colorado in the Spring of 2021. They were Fr. Jackson's parishioners at that time. The funeral Mass was televised live and Fr. Jackson's homily was a source of consolation to the family in its darkest hour. Finally, though it was not his preference—being a Midwesterner, he was transferred to St. Mary's parish in Providence, Rhode Island.

It is standard operating procedure that when a new priest arrives from outside a diocese, a thorough investigation is conducted. Fr. Jackson served in Kansas, Oklahoma, Nebraska, Colorado, and finally, Rhode Island; the Fraternity itself had conducted its own investigation and found that his reputation was "sterling." Rhetorical question: how is it possible that all these investigations covering more than 35 years of priestly service, led to the same conclusion, and with which, even Bishop Joseph Tobin of the Providence, Rhode Island diocese, had to agree? The short and only answer is that Fr. Jackson's reputation has always been sterling and untarnished and still is.

## Why the Court Should Exercise Extreme Leniency in this Case

Anyone examining this case must be struck by two crucial—and troubling issues. First, any professional clinician or educated lay person, who knows anything about the general and the specific characteristics of the internal grip of any kind of addiction, knows that these addictions do not emerge at the age of 66—Fr. Jackson's age at the time of arrest. To the contrary, it is in the nature of addiction that individuals so afflicted cannot resist the lure of the object of the addiction. Furthermore, one so possessed will risk leaving trails, tracks, digital imprints, or evidence of any kind, in order to satisfy even one, uncontrollable urge. And why is this the case? Because these obsessions were already rooted in the individual from the earliest ages, usually exacerbated in the early to late teen years. Has anyone heard of "repeat offenders"? These individuals have long and sad histories and usually leave behind many, sad victims. Fr. Jackson's personal history and entire adult life completely contradict this *modus operandi*.

Secondly, as this case unfolded in late October 2021, and in the days following, there were many vague or contradictory story lines perpetuated by both religious and secular presses. There seemed to be a particular zeal on the part of state authorities to "get a priest" with no regard to due process. In the early stages of reporting, the same thematic repeated itself over and over. To capture the essence of the repetition, I quote word-for-word from the contributor to the Catholic News Agency article of November 15, 2021:

> The state police had executed a search warrant that day at the parish and arrested Jackson after determining that *he was the owner* of large amounts of pornographic material found on an external hard drive in an office area near his bedroom, the affidavit states.

Really? State Police 'determined' that "Jackson was the owner" of this material prior to arrest? How can that possibly be, when the crux and objective of the investigation is precisely, to determine "who the *owner*" of these materials is—*or how they got there*. It is further stated that the "external hard drive [is] in an office area"—*not that it is in the possession of Fr. Jackson.*

Compounding the confusion, authorities did not confiscate Fr. Jackson's personal computer at the time of his arrest. Another article appearing around the same time, stated in a more fair and impartial manner, that the internet traffic in question had been "*geolocated* to the rectory of St. Mary's Catholic Church"—that, in fact, is about all that could be 'determined' at that point in time without conducting a lengthy interview. How utterly strange is that? It should be noted that digital equipment that is "geolocated" to that parish, belongs *not to the priest*, but to the Fraternity. To be the "owner" in the traditional and common sense of that word, means that one has willfully desired, sought, obtained, and retained the object in question. I have not yet seen *any* information that supports that definition—it has not been provided by journalists or authorities. There was and is much foot traffic that goes in and out of St. Mary's parish.

I assert that it is a metaphysical and actual impossibility that Fr. Jackson had any knowledge that this kind of material was being trafficked. First of all, his knowledge of how the digital world works is scant at best—and in fact, he is inimical to technology; it is contrary to the Benedictine spirit. Secondly, his entire priestly life was and still is, dedicated to the love of God, to the love of Jesus Christ—the Eternal Word Incarnate, to our Blessed Mother, and to the salvation of souls. Fr. Jackson essentially lived the life of a Benedictine monk but ran a parish rather than living in a monastery. It is a well-known fact that St. Mary's parish, Providence, Rhode Island, is geolocated in a strongly pro-LGBTQ neighborhood which is virulently hostile to Catholic teaching on sexual morals and ethics. The bishop of Providence himself, Joseph Tobin, should know this since he was the object of an LGBTQ attack in June 2019 when he forbade his Providence, Rhode Island Catholics from participating in the local gay pride parade; this group is not very tolerant, and the backlash was furious. The incident appeared in local newspapers. Fr. Jackson was a vocal critic of clerical abuse in the Church—a major target being the disgraced former cardinal Theodore McCarrick—who has been in the news recently; he was a vocal proponent of the Church's teaching on sexual behavior and its proper place in sacramental marriage; he is pro-life, and has fought hard against satanic ritual and the black mass—very common events at the end of each October, year in and year out—mere coincidence?

If there is any doubt that a person's personal life and digital world can be turned inside out, consider this 2009 NBC coverage of an article (originally Associated Press) regarding Michael and Robin Fiola whose lives were ripped apart over the very same kind of pornographic-pedophilic hacking: https://www.nbcnews.com/id/wbna33778733. That was 14 years ago, and the dark net and its minions have become exponentially more sophisticated since then. This should concern anyone.

**One Last Thought**
Not only has Fr. Jackson been standing against a deep wave of pervasive immorality, which has had terrible effects on families, but he has been an excellent proponent of the Traditional Latin Mass—as noted earlier. The Fraternity of St. Peter and proponents of this form of Mass received the overwhelming support and approval of Pope St. John Paul II—but on the contrary, have been persecuted by Pope Francis. In other words, there are enemies on all sides and goodness draws evil from myriad sources, some known, many unknown. The medieval saint, St. Catherine of Siena once said of holy men and women, that "the world cannot take away virtues from such a soul, rather all their persecutions increase their virtues" (*The Dialogue*). That is who Fr. Jackson is. I may not know every, single parishioner whom Fr. Jackson has known, but I do personally

know the vast majority of everyone to whom I have referred in this statement; they know me, and they know Fr. Jackson. ***Without exception***, the thousands of people who know him and have been uplifted by him would agree with me that he is a holy man and utterly abhors the very content of which he has been accused.

What about the plea agreement? Two realities face Fr. Jackson. One is the harsh prospect of not seeing his family again as a free man—Father Time and Mortality would influence anyone in this situation. The second reality is more subtle and more spiritual. If he had not agreed to a plea, then this would have entailed a jury trial. A jury would have to visually absorb the most horrific, pornographic material—which could never be unseen once witnessed. Fr. Jackson, being the spiritual man that he is, has a refined conscience and possesses a profound understanding of the psychological and spiritual impact this would exercise on the souls of each, individual juror—and any others exposed to such execrable material. He would rather absorb this suffering in Christ-like fashion, than to have the minds and hearts of unsuspecting jurors tortured in exchange for a mere temporal, personal gain—and one that is not even guaranteed. *What does it profit a man if he gains the whole world and loses his very soul.*

Therefore, I urge you to exercise leniency, correct an injustice that has existed from the beginning of this case, and release him to his family.

Thank you,

John E. Cerkey, 09 / 07 / 2023

## Statement of Support on Behalf of Fr. James Jackson by Adrienne Coleman

My name is Adrienne Althea Coleman and I was the parish secretary of Our Lady of Mt. Carmel church in Littleton, Colorado under Fr. Jackson, from 2011-2021. I understand he has been charged with certain offenses in U.S. District Court for the District of Rhode Island. I offer this statement for the Court's consideration.

To give you a brief description of myself, I am a 53 year old single female who was an officer with the Secret Service Uniformed Division from 1991- 2009. I have a BS in Criminal Justice from George Mason University in Fairfax, Virginia, class of 1991. I provided protection for Presidents from George Herbert Walker Bush (41) to Barack Hussein Obama (44), and was on the Vice President's detail (Biden) when I left in 2009. I left after 18 years with the Secret Service because I felt a call to the religious life. I was in a convent from 2009-2010, and that religious order no longer exists. After the convent, I settled in the Denver area and became a parishioner of Our Lady of Mt. Carmel in 2011. Fr. Jackson hired me as the parish's part time secretary that same year, and I retired a few weeks before he was transferred to Rhode Island in the summer of 2021. I currently work as a part-time caretaker for a handicapped young lady as a personal care assistant.

While working at Our Lady of Mt. Carmel (OLMC), I was in the parish office Monday through Friday for 3 or 4 hours a day in the afternoons, for 9 ½ years. I saw Fr. Jackson several times a week during those years. The rectory (priest's house) was across the street, and the priests had their offices there, but met with parishioners for spiritual direction, sacramental preparation, and other meetings, in a room next to our office. Father also had a Tuesday night adult Catechism class during his duration at the parish, where his sense of humor really shined. His commentaries in the weekly bulletins were also a glimpse into Father's thoughts. When going on vacation to the mountains, he would sometimes publish his planned schedule in the bulletin, which was generally organized in 15 minute increments from waking to sleeping. I was impressed by his extreme discipline and it was always inspiring. He said that his time management was how he was able to research and write his books, answer hundreds of emails, say his prayers, do spiritual reading, and return phone calls, etc. As the Pastor, he had to report

to the Priestly Fraternity of St. Peter, the Archdiocese of Denver, his staff, and over one thousand parishioners.

As a supervisor, I must say that he was the best boss anyone could ever hope to have. He is a very holy and kind priest, and he never micromanaged his staff. He just let you do your job. If correction was necessary, he was always kind and never accusatory. In making decisions, he would take everyone's opinions into consideration and was very thoughtful in his answers. Our office used computers, certainly, but for some things, our process was pen and paper, as that was Father's style. To sign-up for adoration, you had to enter your name in the 3-ring binder in the back of the church. Now they use SignUp Genius, via email. Even when we sent out emails to the parish, he asked us to send as few as possible to get the job done, so as not to inundate people. We could not contact him via text message, as I was told that he did not have it enabled on his cell phone. I knew him to be a monastic man, meaning that he preferred to stay at home with a good book, rather than to be overly social. He is well read, and I remember him expressing, even in a sermon, that he understood the weight of his spiritual responsibility to the souls in his care. Fr. Jackson had a great ability to prioritize things, and was an overall capable and beloved leader of the parish and the Fraternity of St. Peter. As I mentioned, Father was extremely disciplined, which seemed very Marine-like, as was his background, but it was also because of the knowledge in our Faith, that we will be held accountable on judgement day for our use of the time that God has freely and mercifully given to us to workout our salvation. Over the years, Father has had 7 children named after him, as far as I know, and I remember several people who knew him from his years as a priest in Kansas, who came to Colorado just to visit him. Father often spoke of his family, his background, previous jobs, his conversion story in college, his friends, and was generally an open book to anyone who knew him. He is like a Father to me, and I find him to be a man of integrity, duty, selflessness, honesty, and I miss and respect him greatly.

A thought that has crossed my mind, is why would a man guilty of the charges he is accused of, hire a cop for a secretary? With my degree in Law Enforcement, which included classes in abnormal psychology, I saw nothing aberrant in his psyche, demeanor, or behavior, that I have observed in 9 1/2 years of working for him. And in my experience, he was definitely naïve about having the computer literacy to do such a thing. He did not like technology, period. I

2

have never believed for a minute that Fr. Jackson is guilty of the accusations at hand. In my opinion, Father is on the front lines of the spiritual battle which is in full swing in our culture and society today. Father is a big target because of the books he has written, the movie Mass of the Ages that he was in, and he had just been selected as one of the 5 priests to head the new Provincial Council for the North American Province for the Fraternity of St. Peter.

Your Honor, I think you can get a good sense of the man by speaking with him in person. He has always been very humble, and after this experience, I'm sure he is even more-so now. He looks for the absolute truth in everything, and his greatest concern is not to offend God. The world could not ask for a better example of a holy and pious man and priest. He is a Saint in the making. Thank you for your consideration of my testimony, and I pray for your discernment in this matter.

God bless you,   Adrienne Coleman  (720) 469-7253

3

# Statement of Support for Fr. James W. Jackson by Michael Malak

Michael Malak
1371 13th St.
Sarasota, FL 34236
michaelmalak@yahoo.com
Cell: 703-624-0432

August 21, 2023

My name is Michael Malak and I was a parishioner at Our Lady of Mount Carmel in Littleton, Colorado, where James Jackson was pastor, from 2009 to 2021. I understand James Jackson recently pleaded guilty to certain offenses in U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

As a way of introduction, I have been employed as a software developer for 35 years so far, and I presently telecommute from my home in Florida to a Fortune 100 in Silicon Valley. I have an M.S. Math from George Mason University, hold a dozen patents in Computer Science, and I speak regularly at conferences. I am a convert to the Catholic faith, having been confirmed in the Church in 1994, and in those early years, I was zealous enough to evangelize door-to-door with the Legion of Mary organization. I continue in a lesser manner these days, answering questions online about Catholicism. I married in 1996 and have two teen children. I have owned a few businesses over the years, including those with employees.

Although my knowing James Jackson is largely through exchanging a dozen mailed letters over the years with him, and through listening for over 12 years to his sermons, reading his bulletin inserts, listening to his lectures, and hearing his advice in the confessional, I did have opportunity to meet with him personally a handful of times, mostly about difficulties in my marriage. This included a private dinner my wife and I hosted at our house. I attribute the present happiness in my marriage to the help he gave over the years. In the aforementioned sermons, bulletin inserts, and lectures, although it was mostly about theology, he did on occasion reveal a few personal details, such as his daily schedule broken into 15-minute intervals, his life in seminary, his retreats, and present medical issues.

Mine was not the only marriage that James Jackson saved; he saved the marriages of many other parishioners. He was dedicated to the parish. Under COVID restrictions, he instituted a grueling schedule of nine Masses each Sunday to accommodate social distancing (three Masses for each of the three priests). He made every effort to avoid scandal by avoiding words either too harsh or not harsh enough, as the situation demanded. He also avoided scandal by keeping his office door open whenever he was meeting with someone. The impression he gave – and the service he provided in actuality – was that of a pious, virtuous man. The crime to which he plead guilty must have been very well hidden, as it does not reflect his other words and actions.

It has been said that on some of his electronic devices, offending files had been deleted. For those unfamiliar with the practice of confession in the Catholic Church, this matches up with someone truly trying to reform their lives. Catholic doctrine says that a good and valid confession must include a firm

purpose of amendment. There can be no firm purpose of amendment if offending files are left on a device. It would be like someone cohabiting with someone else in a relationship, and they just go to confession and habitually and intentionally with forethought break the Sixth Commandment. A good priest hearing such a confession would require such a person to move out before giving absolution.

In light of James Jackson's apparent attempts to reform, and given the lack of in-person victims, please be lenient. Time served thus far would seem to be commensurate with the crime.

However, the statistical recidivism cannot be ignored. Perhaps the following proposal can address that. In the case of James Jackson, he has often visited monasteries and has felt called to the monastic life. If a monastery can be found where there are no children and where internet can be very strictly controlled and monitored (or perhaps even where personal devices are banned), that could be a way to ensure he does not re-offend. As someone whom I respect said, without demand, there is no supply. Transferring pictures and videos encourages producers to make more in the future. Permanent supervised probation for James Jackson, as well as for anyone convicted of similar crimes, would be appropriate, given the statistical recidivism. Government-monitored probation would provide additional security beyond what the leaders of a monastery alone could provide.

## Statement of Support on Behalf of James W. Jackson by Sarah E. Herth

My name is Sarah Eileen Herth, I was mentored by James Jackson. I understand James recently pleaded guilty to certain offenses in U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

I am a 40-year-old married mother of four and currently reside in Spring Creek, Nevada. My husband and I have been married for 12 years. Our children are 11, 10, 6, and 4, and we homeschool. I have a bachelor's degree in elementary and early childhood education from Hastings College (Hastings, Nebraska). Following graduation from college in 2005, I worked for FOCUS (Fellowship of Catholic University Students) for 8 years before becoming a stay-at-home mom. Last fall I began working for FOCUS again part-time. I was born in Peoria, Illinois and also lived in Garner, Iowa, but those were from birth to age 7, so I claim Kearney, Nebraska as my home, where I lived from 1989-2005. I have also lived in Hastings, Nebraska (2001-2005, during the academic year); Lincoln, Nebraska (2005-2007); Denver, Colorado (2007-2011); Farmington, New Mexico (2011-2018); and currently reside in Spring Creek, Nevada (since 2018) where my husband is a senior geologist at a gold mine.

I met James while I was living in Denver, Colorado. I believe it was 2008 when I occasionally began attending Our Lady of Mount Carmel (Littleton, Colorado) where James was serving as pastor. I was new to the traditional Catholic Latin Mass, but quickly fell in love with its beauty and reverence for Our Lord in the Holy Eucharist. I observed that the priests (James & Rev. Joseph Hearty at the time) were quite possibly the most devout, reverent, intellectual, and deeply committed Catholics I had ever met. The homilies I heard given by James struck me as intellectual, instructional, deeply thought out, carefully written, not sugar-coating truth; but more than anything, I could tell that James intimately knew and loved the God and Catholic Church that he spoke of. I had yet to find a priest to serve as my spiritual director since I moved to Denver, and since I very much respected James's character and his deep insights, I asked if he would be my spiritual director, and he agreed. A spiritual director is a priest who serves as a mentor, guide, and instructor in the practice of the Catholic faith and a life of prayer and virtue. James and I met regularly for several years while I lived in Denver. We met privately one-on-one since we discussed private matters of my life, however, there was always a window where we could easily be seen, and his secretary knew of his schedule. I never once felt uncomfortable or unsafe with James. I also watched James interact socially with others who attended Our Lady of Mount Carmel as well as in a teaching setting. He was always completely professional and entirely committed to his priestly vocation. When I moved away from Denver, I failed to stay in regular communication with James, but I would reach out to him occasionally by email. I last saw James in person in June 2021 at Our Lady of Mount Carmel. I was struggling in my life and was having trouble finding support and James offered to do spiritual direction via letter writing, as he wanted to support me in my struggles. Letter writing has become an old/unpopular way of communicating, but James was never very savvy with technology, and he had a love for the lost art of letter writing. I am a busy homeschooling mom, so I was slow at sending my first letter to James, so he did not receive it until he had already been arrested in Rhode Island. Since his arrest in 2021 until now, I have sent and received many letters to/from James. He did not speak of his legal proceedings, and I never asked, but he supported me in my struggles even amid his own. He put my wellbeing first and remained loyal to the promise of support he had made to me the last time I saw him.

For me, James has been a treasured spiritual father and incredible role model. In the fast-paced world that we live in, I admired how James lived an ordered and regimented life, that was lived at an intentional pace set by him, not rushed by the world. I saw in him a man of deep prayer, deep love for Christ & His Holy Catholic Church, a priest's priest (one any young priest could look up to), a man of great virtue/high moral character and working very intentionally toward sanctity. I will always be incredibly appreciative of the example he set for me and the spiritual guidance I received from him. James made a lasting impact in my life, and I will always be extremely grateful.

The charges that have been brought upon James have completely shocked and stunned everyone, including me. I have never thought that he would ever do or possibly did something so heinous as viewing pornography, especially that of children. It is so completely out of character of the man I always knew him to be. He even wrote and spoke out vehemently condemning Catholic priests who abuse children. In a letter to me, the only time he ever mentioned his legal proceedings, James mentioned to me that the reason he pled guilty was to prevent the innocent jury from being forced to watch pornography. Once again, putting others before himself, even if it means prison time for him. Very, very few people would ever do that. I have no reason to not believe him, absolutely no reason to question the legitimacy of what he told me. I have always known James to be an honest, trustworthy man who lived a life far beyond reproach. Trusting what he told me to be the truth behind him pleading guilty, means to me what I have always believed, that he is innocent of these horrifying charges and yet, he is sitting in prison. Suffering in prison! Not only that, but he has been stripped of his priesthood, his beloved vocation he was completely committed to and poured his entire life into. His reputation and his name have been absolutely massacred. His entire life has been demolished. It greatly pains me to have to refer to him as James in this letter. He is and always will be Fr. Jackson to me. He was exceptionally admired and respected as a priest of the Fraternity of Saint Peter, in the Latin Mass community, in the Archdiocese of Denver, and far beyond. He was a well-respected author of many articles, writings in his weekly church bulletin, and a book he wrote on the Latin Mass (*Nothing Superfluous*). He used his love for Christ and the Catholic Church and his sharp intellect in powerful ways to make lasting impacts on people, communities, our culture, and our society.

I strongly urge the Judge and the Court to show tremendous mercy and leniency toward James. Our world is in desperate need of Christ-loving Catholic leaders who will improve our culture and our world. James is one of those people and to have him sitting in prison, especially if he is indeed innocent as I believe him to be, is a devastating loss to our society.

Respectfully Signed,

*Sarah Herth*

Sarah E. Herth

+AD MAIOREM DEI GLORIAM+

 

**Brigittini Servitores Sanctissimi Salvatoris Institute**
Residentia Beatus Vilmos Apor
P. O. Box 4025 Tyler TX 75712
e-mail: servitores5@gmail.com
WEB: http://brigittiniservitores.com

**From:** Mother Margarita OSsS
          Superior Principalis, BSSI
**To:** Law Office of John L. Calcagni, III
72 Clifford St Suite 300, Providence, RI 02903

**Subject:** Comments on the Rev. Father Jackson case

Feast of Saint Philip o Benitii, Augst 23rd,2023

Dear Mr. Calcagn:
I am attaching my plea for leniency to this note. That document also lists my qualifications.

I am grateful for you to be willing to defend Rev. Fr. Jackson in Court. I also hope that if I make some recommendations, you do not consider it insolent, just an opinion which can be considered or discarded.
I am attaching my plea for leniency to this note. That document also lists my qualifications.

**Number one**, I understand that you ordered a psychiatric evaluation and I think this is an excellent move and may give us some surprising answers. Will it make a difference if this evaluation is not completed by the beginning of the trial?

**Number two**, given Fr. Jackson's concern for not scandalising the jury, would a trial without a jury(bench trial) be feasible, if the guilty verdict is changed to not guilty?
I beg you to consider this possibility

Please forgive my boldness in addressing you. As I see it pleading guilty will inevitably result in Rev. Father Jackson's laicisation. For most Catholic priests, this is a fate worst than death . For a priest of Fathers'' quality, it is especially so. I have been corresponding with Father during his incarceration and I am impressed how Father was dreading this possibility.

If he is found guilty, yet pleaded not guilty, it may be possible for Father to retain his priesthood, especially if an appeal is lodged.. Even if because of his not guilty plea, which means no plea deal, ,his sentence is longer, he has the consolation of functioning as priest by sanctifying the place by his prayerful presence, perhaps helping prisoners' . In some cases, imprisoned priests were allowed to celebrate Holy Mass privately. The place where the priest works is assigned by their b isop, o religious Superior; for imprisoned priests, the assignment is made directly by Divine Providence. An imprisoned lawyer, teacher or businessman ceases to function as such, an imprisoned priest, not laicised, remains a priest
If I can be of any help to you, the contact information is below. The phone number of the Brigittini Servitores is (903) 526-0511.
Assuring you of my prayers, good wishes and high regards, I remain
Yours gratefully

Mother Margarita OSsS

-

✝AD MAIOREM DEI GLORIAM✝




**Brigittini Servitores Sanctissimi Salvatoris Institute**
Residentia Beatus Vilmos Apor
P. O. Box 4025 Tyler TX 75712
e-mail: servitores5@gmail.com
WEB: http://brigittiniservitores.com

**From:** Mother Margarita OSsS
Superior Principalis, BSSI
**To:** The Court , through
Law Office of John L. Calcagni, III
72 Clifford St Suite 300, Providence, RI 02903
**Subject:** Rev. Father  Jackson  case – plea  for leniency

Feast of Saint  Philip o Benitii, Augst 23rd,2023

I am respectfully begging the Court for leniency in sentencing Rev. Fr. Jackson, FSSP.

My background is:
I am a Naturalised USA  Citizen of Hungarian origin, who had to go into exile  at the ripe age of 20 after the 1956 Revolution in Hungary.
My academic qualifications include a Medical Degree in England( MBB S, University Hospital College , London, England.)
I have also earned a PhD in Greek and Latin at Ohio State University in Columbus, Ohio, USA.
I also hold  qualification as a surgeon, having passed the qualifying examination for Fellowship Ot the Royal College of Surgeons of Canada.
In secular life, I ave practiced medicine and surgery both in England and in the United States.  T I was also a Teaching Associate at OSU while working for my PhD. I am fluent in three languages, namely, English, Hungarian, and Latin, read French well and have  some familiarity with 3 others.
Shortly after midlife, God has  d called me to religious life.  I am the founding Superior of the Brigittini Servitores Sanctissimi Salvatoris Institute.  Our religious group is closely associated with the Fraternity of St. Peter, an institute of Apostolic life of which Rev. Fr. James Jackson is a member.

**My contacts with Fr. Jackson** have been rare but very inspiring and productive.  I paid my respect to Rev. Fr. Jackson when he was the Rector of the Seminary of FSSP.  I also contacted him when one of his parishioners came to us on a visit to test her religious vocation.  The purpose of the contact was to make Fr. Jackson familiar with the work of the Brigittini Servitores. However, even aside from this contact, Fr. Jackson's name is s a household name among Catholics.  He wrote a book, and several articles and his opinions were often widely quoted as reliable and sane.

The Fraternity of St. Peter, of which Fr. Jackson is a member, is an association of priests celebrating the Traditional Latin Liturgy with the permission of the Holy See.  Fr. Jackson became a secular priest but many of his college classmates who also attended courses at the University of Kansas by Dr. Senior, a professor who was Catholic and was an inspiration to many of his students.  Several of these students went to the Benedictine Abbey of Fontgombault , France and became Benedictine Monks.  A group of them came back to the USA and founded the Benedictine Monastery in Clear  Creek  Oklahoma on a land donated to them.  This community has 61 monks and is flourishing.  Fr. Jackson is a Third Order Oblate r of this community and is very highly regarded by them.

Page 1 of 2

✝AD MAIOREM DEI GLORIAM✝

If you look at my qualifications, you probably guess that I am careful in judging people and do not shower compliments on every Tom, Dick, and Harry. Please, therefore, take into consideration my good opinion of Fr. Jackson as something that is based on facts and observations.

It is for the Court to decide on a sentence. I am aware of Fr. Jackson pleading guilty but am not convinced this is really so. Realising that pornographic material would be shown to the jury unless he plead guilty, he entered a guilty plea in order not to harm the souls of members of the Jury. For some reason, probably valid, the option of Bench Trial was not considered.
As for an innocent man pleading guilty, historically that happens quite often when a prisoner quite simply breaks down under the hardships of imprisonment. I am not a lawyer and I'm not quite sure if this is the case here, but I certainly entertain this possibility.
Submitted in a hopeful spirit for the leniency of the Court, I remain,
Yours sincerely

Mother Margarita OSsS

-

AMDG

AMDG

Aug. 23rd

I am respectfully begging the Court for leniency in sentencing Rev. Fr. Jackson, FSSP.

My background is:
I am a Naturalised USA  Citizen of Hungarian origin, who had to go into exile  at the ripe age of 20 after the 1956 Revolution in Hungary.
My academic qualifications include a Medical Degree in England( MBB S, University Hospital College , London, England.)
I have also earned a PhD in Greek and Latin at Ohio State University in Columbus, Ohio, USA.
I also hold  qualification as a surgeon, having passed the qualifying examination for Fellowship Ot the Royal College of Surgeons of Canada.
In secular life, I ave practiced medicine and surgery both in England and in the United States.  T I was also a Teaching Associate at OSU while working for my PhD. I am fluent in three languages, namely, English, Hungarian, and Latin, read French well and have  some familiarity with 3 others.
Shortly after midlife, God Hs d called me to religious life.  I am the founding Superior of the Brigittini Servitores Sanctissimi Salvatoris Institute.  Our religious group is closely associated with the Fraternity of St. Peter, an institute of Apostolic life of which Rev. Fr. James Jackson is a member.

**My contacts with Fr. Jackson** have been rare but very inspiring and productive.  I paid my respect to Rev. Fr. Jackson when he was the Rector of the Seminary of FSSP.  I also contacted him when one of his parishioners came to us on a visit to test her religious vocation.  The purpose of the contact was to make Fr. Jackson familiar with the work of the Brigittini Servitores.  However, even aside from this contact, Fr. Jackson's name is s a household name among Catholics.  He wrote a book, and several articles and his opinions were often widely quoted as reliable and sane.
 The Fraternity of St. Peter, of which Fr. Jackson is a member, is an association of priests celebrating the Traditional Latin Liturgy with the permission of the Holy See. Fr. Jackson became a secular priest but many of his college classmates who also attended courses at the University of Kansas by Dr. Senior, a professor who was Catholic and was an inspiration to many of his students.  Several of these students went to the Benedictine Abbey of Fontgombault , France and became Benedictine Monks.  A group of them came back to the USA and founded the Benedictine Monastery in Clear  Creek  Oklahoma on a land donated to them.  This community has 61 monks and is flourishing.  Fr. Jackson is a Third Order Oblate r of this community and is very highly regarded by them.

If you look at my qualifications, you probably guess that I am careful in judging people and do not shower compliments on every Tom, Dick, and Harry.  Please, therefore, take into consideration my good opinion of Fr. Jackson as something that is based on facts and observations.

AMDG

It is for the Court to decide on a sentence.  I am aware of Fr. Jackson pleading guilty but am not convinced this is really so.  Realising that pornographic material would be shown to the jury unless he plead guilty, he entered a guilty plea in order not to harm the souls of members  of the  Jury.   For some reason, probably valid, the option of Bench Trial was not considered.

  As for an innocent man pleading guilty, historically that happens quite often when a prisoner quite simply breaks down under the hardships of imprisonment.  I am not a lawyer and I'm not quite sure if this is the case here, but I certainly entertain this possibility.

Submitted in a hopeful spirit for the leniency of the Court, I remain,

Yours sincerely

Mother Margarita OSsS
Superior Principalis
Brigittini Servitores Sanctissimi Salvatoris Inst.
P. O. Box 4025 Tyler TX 75712
WEB: http://brigittiniservitores.com/



**OUR LADY OF MT. CARMEL CATHOLIC PARISH**
5612 S. Hickory St.
Littleton, CO 80120
(303) 703-8538

Fr. Daniel Nolan, FSSP                                                      21 Sep 2023
*Associate Pastor*


**Statement on behalf of James W. Jackson by Fr. Daniel Nolan**

My name is Fr. Daniel Nolan, and I was the associate pastor for Fr. Jackson for over 3 years,
from January 2018, until July of 2021, at Our Lady of Mt. Carmel Parish in CO. I understand
that James Jackson recently pleaded guilty to certain offenses in the US District Court RI, and
will soon be sentenced. I am offering this statement of support on his behalf.

I originally met Fr. Jackson 23 years ago in 2000, the year I graduated from the U.S. Naval
Academy with a degree in Systems Engineering. He was assigned pastor of the Latin Mass
Church in Oklahoma, and I met him while on leave. I had been commissioned a 2nd Lieutenant
in the USMC, and prior to deployment was visiting my family. He was serious, disciplined, and
left an impression on me.

I continued to serve in the Marine Corps for the next 6 years, deploying to Okinawa, Japan,
Guantanamo Bay Cuba, and the Republic of Georgia. I participated in operation Iraqi Freedom
in 2003 and received an honorable discharge in 2006. In the fall of 2007 I entered OLG
Seminary in Lincoln, NE, and met again with Fr. Jackson briefly, who had just finished serving
the seminary as rector for several years. I was ordained a priest in 2014 and assigned to St. Joan
of Arc parish in Idaho for 3 years, until transferred to my current assignment in CO.

In all my dealings with Fr. Jackson, I found him to be disciplined, diligent, and very
professional. While making home visits, he was gentlemanly and erudite, but also personable
and charming. He could regale listeners with stories and jokes, accents and inflections. When I
first met Fr. Jackson, I imagined him to be one of the best and most capable priests I had ever
known. In my later dealings as his assistant pastor however, I began to see his flaws. He was
not quite as capable as people seemed to think, nor was he very administratively savvy. He
seemed to have a wonderful reputation, which he valued it very highly, but it seemed to me
exaggerated.

But despite his flaws as a leader, I never saw any obvious personal failures of a moral nature.
He was careful and proper in his interactions with the faithful, gave excellent sermons, and was
unfailingly polite. We prayed twice a day together, and enjoyed a community meal at lunch

daily. In none of his behavior did he ever exhibit a tendency toward the crime which I found out later to be true. The character he had displayed over the three years I had known him as his assistant, and even longer as a priest and family friend, seemed very solid.

Therefore, it was all the more shocking to me when I discovered the truth. But, I visited him in the Wyatt Detention facility this past June, and have written several letters back & forth since then, and have been pleased with his remorse and intention to seek remediation. I believe he will never commit this crime again, as long as he has good supervision and is in a good environment. Much of the goodness and discipline he displayed over his whole life is still there.

Therefore, I think the best result would be for Fr. Jackson to receive much less of a jail sentence, but afterwards be assigned to a Catholic monastery for life. In the company of other good and moral men, he would be provided with a good example, and be properly supervised. I believe very firmly he would do much good in such circumstances, both for the monastic community and society as a whole. He has retained his good manners, disciplined work ethic, high intelligence and capacity to study and write, all of which I am certain would be used for the good of the Church and his own remediation. Thank you for your consideration.

Fr. Daniel R. Nolan, FSSP.

## Statement of Support on Behalf of James W. Jackson by Fr. Justin Nolan

My name is Fr. Justin Nolan, FSSP. I am a professional colleague as well as long time personal friend of Fr. James W. Jackson. I understand Fr. Jackson recently pleaded guilty to certain offenses in U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

I am a Catholic priest serving in the Priestly Fraternity of St. Peter, the same religious community in which Fr. James Jackson also served. I am 48 years old. I was ordained a priest in 2008 and have been a priest now for fifteen years. I currently work in the Catholic Diocese of Lexington, Kentucky serving as Assistant Chaplain to the people of the Regina Pacis Latin Mass Community in Georgetown, KY. Prior to my ordination to the priesthood, I was in seminary for seven years where I earned the equivalent of a masters degree in religious studies. Prior to seminary I worked in the business world for eight years managing an IT company in the telecommunications industry both in the United States and overseas in England. I grew up in the Oklahoma City area. For the majority of my adult life I have been in positions of leadership and management, both of organizations and human resources. As a priest I have had many years of experience in dealing with the complex psychological, emotional, and spiritual problems that people frequently bring to a priest for counsel.

I have known Fr. James Jackson for over 26 years. I first met him in 1996 when I was 21 years old. He was the chaplain for the local Latin Mass Community in Oklahoma City, Oklahoma where I lived and attended Mass at the time. My family had him several times to our home for dinner and I was able to observe his interactions with my parents and eight siblings, several of whom were just small children at the time. I also observed his habitual interactions with the other parishioners after Mass, during parish functions, and in various family homes at social gatherings. In 1997 I asked him to be my spiritual director and met with him regularly for spiritual direction over the next several years. In 2000, he was transferred to be the rector of Our Lady of Guadalupe Seminary in Denton, Nebraska. In 2001 I applied for entrance to the same seminary and was accepted. During my first five years in seminary I had the opportunity to observe him in his conduct as rector and his interactions with myself and the other seminarians on a daily basis. In 2006 he was transferred to be the pastor of Our Lady of Mount Carmel in Littleton, Colorado. Since that time my interactions with him have been less frequent but I always heard good reports about him from the parishioners and those who knew him in

**Statement of Support on Behalf of James W. Jackson by Fr. Justin Nolan**

Colorado.  As priests in the same religious order we have always been on good terms both personally and professionally.

In all of my interactions with Fr. Jackson he never behaved in any manner less than professional.  This was true whether he was interacting with me, with my family, with other priests, with seminarians, with other families, with parents, or with children.  He was always cordial, respectful, polite, well spoken, kind, gentlemanly.  He never cursed or used foul language.  He was never overly familiar or given to any inappropriate words, gestures, or actions.  He was the consummate gentleman in all his dealings with parishioners, seminarians, priests, and people.  I would be hard pressed to identify any faults in his character or behavior. He had no discernable vices.  He was very disciplined in his private life, not given to gluttony or drinking.  I many times witnessed his kindness to others particularly when people would ask favors or were in need of money or assistance. He was always ready and immediately willing to help or find solutions to their problems.  Of all the priests in my religious community who have been in positions of authority over me, he was the one who showed me the most kindness and genuine solicitude for my well being.  If it was not for Fr. Jackson's kindness to me, it is likely I would not be a priest.  It was his example that first inspired me to seek the priesthood, and it was his willingness to accept me to seminary that made it possible.

It is incomprehensible to me that Fr. Jackson could be guilty of the crimes he has pled guilty to and I can only believe that it was in the face of possible life imprisonment that compelled him to do so.  I do not believe he is in any way a threat to society.  Out of prison he would devote the remaining years of his life to prayer and study.  His kindness, his knowledge, his wisdom, his good will to humanity, the books he has written and would continue to write, all this would most certainly be of great benefit to the many, many people who are and continue to be devoted to him.  I ask you, Your Honor, to please grant him clemency in regard to his sentence.

Respectfully,

Fr. Justin Nolan, FSSP

## Summary of Support on Behalf of James W Jackson by Terence L Sercer, Certified Public Accountant

My name is Terence L Sercer, Certified Public Accountant, and live in Fort Scott Kansas. I graduated from the University of Kansas (KU) in 1982 with a BS in Accounting and became a CPA working in public accounting soon thereafter. My concentration has been mostly in auditing as I have performed about 1000 audits throughout the years, including compliance audits and detection of fraud. I retired this year after 41 years of public service. My wife Monica and I have seven children: two have entered the religious life, one is a single contractor, one works in the military, and three are married. We have been blessed with six grandchildren so far with more to come, God willing. We have lived in Fort Scott Kansas for the last 37 years working at the same job and living in the same house the whole time. Now retired, I volunteer work with three different nonprofit entities. I have been blessed in many ways.

James Jackson graduated from KU a couple years before I did, but I knew him while in college. We both attended a special undergraduate program at KU named the Integrated Humanities Program (IHP). At its prime, the IHP had over 150 students enrolled in the two-year program. My father-in-law, Dr Dennis Quinn, was the director of the IHP and taught with two other full-time professors. Students in the IHP were very enthusiastic about the program and formed a close-knit group on campus. Friendships were made that have lasted a lifetime. Graduates of the Program include lawyers, doctors, men and women in the religious life, and many marriages. The graduates still get together every few years for a reunion at which about 200 attended a few years ago.

My association with James Jackson began at gatherings during my college years as well as at reunions after college. We exchange normal Christmas cards over the years. James Jackson became a priest and we kept in touch through out the years, including these IHP reunions. There were several times that Fr Jackson gave religious talks at my church or at other events at which I attended. His talks were always very edifying, spiritual and beneficial to me. He spoke words of wisdom that were inspiring to me and to others in attendance.

My discussions with Fr Jackson showed him to always be a deep, spiritual man, filled with the love and God, a man that I would trust to give spiritual advice to me, my wife, or my children. It is inconceivable to me that Fr Jackson could have committed the offences he was accused of. It is so very out of character of the James Jackson that I have know for many years. Fr Jackson wrote a book about the Catholic Mass which was superb, very well done, and an benefit to all who read it. I believe that he could still be helpful to many here on this earth.

Why do I believe that the judge should be lenient towards James Jackson during sentencing? First off, he already has received a crushing blow, losing his priestly duties towards his parishioners, parishioners that he loved and that loved him in return. Secondly, he is getting to be an older man. How many more years does he have on this earth? How long of a sentence is really necessary? Finally, though, the biggest reason I would plead for leniency would be that Fr Jackson has already been punished in losing his priestly identity, something he worked his life at. I know that he must be crushed to know that he no longer can practice as a priest. However, I do believe that James Jackson the man still has much good in him and can be a benefit to society after his penance is served.

Sincerely,

*Terence L Sercer* CPA

Terence L Sercer, CPA

## Statement of Support on Behalf of James W. Jackson by Brandon Smith

My name is Brandon Smith, and I am currently a friend of James. I was his parishioner in Denver from August of 2009, and in April of 2017, he asked me to join the finance council to help provide oversight for the finances of the parish. In that time, we got to know each other quite well through the life of the parish. I understand James recently pleaded guilty to certain offenses in the U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the court's consideration for sentencing purposes.

I'm a happily married father of 7 children, aged 10, 9, 7, 5, 3, 2 and 9 months. We live in rural Arkansas outside the city of Cabot. By trade, I am a software engineer who works in aerospace. I have a degree in computer simulation engineering, and a degree in philosophy with a minor in computer science.

The reality of sex offenders is very real to us, as there are two who live near to us. One is right next door, the other, further down the street. I have never seen the one next door, but the other, who lives down the street, likes to drive around on his ATV, scoping out the neighborhood. Neither sex offender frightens us, since we know where the boundaries are and we're in a position to protect ourselves and our children.

To relate a personal anecdote, several years ago, I had a severe infection of my left knee. It was so bad that I spent time in the hospital. The timing was such that my hospital stay prevented me from coming to Mass on Sunday. Sundays are exhausting days for those who do parish work, but it didn't take more than a brief request from my wife to have him make his way to my hospital room when his duties at the parish were completed. His visit was not brief either, spending a couple hours talking with my wife and I. His presence was calming and enlightening, which is something that came from his efforts to lead a life of virtue. Each one of us is a blend of virtue and vice, and even though there was a hidden vice, it doesn't change the fact that James also cultivated virtue, and it was an exchange of virtue that kept him in my hospital room.

Lest there be any confusion, I want to be absolutely clear on one thing. I condemn the actions that have led to James' current situation. As a student of Philosophy, a book titled, "The

Consolation of Philosophy" by Boethius comes to mind. One of the central points of the book is that the worst thing that can happen to a criminal is that they be left unpunished. The assertion is that human beings are made to be good, and failing that, they become less than what they're supposed to be. Punishment, or, more accurately, correction, gives the criminal a chance to repent and grow in goodness. I want my friend James to be afforded this opportunity. As it is, he is saddled with the lifelong reality of being known by the worst thing he ever did — something that not many are subjected to. Knowing James as I do, even with his guilty plea, I would eagerly welcome him to live down the street from my family. In my estimation, the duration of his prison sentence is not the punishment that hurts, but the loss of his reputation and being forced to live out his days as a man known for the worst thing he has done. Given James' belief system, I'm confident that his loss of reputation more than satisfies Boethius' call that the criminal be punished. Thank you for considering my words in this matter.

Brandon Smith

## Statement of Support on Behalf of James W. Jackson by Lisa Smith

My name is Lisa Smith and I am a friend of James and former parishioner from his parish in Littleton, CO. I understand James recently pleaded guilty to certain offenses in U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

I am a stay at home wife and mother of 7 children, ages 9 months through 10 years. I live a simple life, striving to teach my children to love the good, the true, and the beautiful. I hope to send into the next generation strong men and women who know and value hard work and who demonstrate integrity. Originally, I come from Colorado, where I was educated at Colorado College and earned a Bachelor of Arts in Economics and Business in 2007. While there I was inducted into the Phi Beta Kappa Honor Society. Currently I live in Cabot, AR.

I became acquainted with James at Our Lady of Mount Carmel (OLMC) in 2011. He was a good friend to my husband, however for several years I knew him best by his writing and speaking. His wisdom and insights were very formative for me in how I came to understand what it meant to live a good and moral life. I have always found him to be a compelling and thought provoking speaker, offering challenging but achievable calls to action in developing discipline, vision, and purpose. For many years now I have given great weight to his teaching. Over time, as we became better friends, my family invited him to our home for dinner where we enjoyed his wonderful story telling and sense of humor.

My experience of James is that he led a carefully regulated life, making sure that his time was planned out such that all the important things found a space in his schedule. He did not leave gaps in his schedule for idleness. It was impressive to see his books take shape even with the full schedule of a pastor of a quickly growing church. He was a person with a rich prayer life that was not neglected despite the many pulls on his time. He was readily available to those who asked for his time for spiritual direction, but somehow he still managed to complete several major fund raising campaigns and building projects. The most notable project was construction of a new church designed in the traditional, gothic style – a true masterpiece. It was unbelievable to watch the parish transform under his leadership. He communicated a grand vision to architects, artists, and construction workers, navigated challenging permitting processes, and inspired a congregation that exploded from about 200 people on a regular Sunday to more than 1300 by the time we moved away from Colorado in 2022. His wide range of interpersonal skills and ability to work with all kinds of people was striking.

When I was struggling personally with how to navigate some challenging relationships with my father and sister, I sought his advice and counsel. I frequently remind myself of his input on that situation and it has guided me well in setting good boundaries and appropriate expectations for those relationships. My husband and I continue to cite things that he wrote or said when we are in the midst of a sticky situation, or a decision to be made. "I remember James once said..." continues to be a regular part of our conversations, particularly when we are faced with challenges.

In terms of James' personal conduct around children and families, my experience was that he went above and beyond to provide an environment that ensured safety. He maintained proper physical boundaries, not offering hugs or more than a handshake unless a hug was offered to him. He described this sense of propriety in one of his weekly bulletin inserts. He didn't spend time alone with children, and the offices that he used were fitted with windows. His care in setting boundaries, communicating

Statement of Support on behalf of James W. Jackson by Lisa Smith pg. 1 Of 2

them, and then following them with great consistency was notable.

One of the most impactful aspects of his time at OLMC were his bulletin inserts. Every week he wrote about news around the parish, what he was currently reading or studying, or cultural observations and advice. So consistently interesting and helpful were these letters, many people never failed to pick one up on Sunday. As a group of parishioners, we missed these letters so much after he left that we began downloading them from his new assignment in Providence, RI and discussing the news from this new parish over coffee on Sundays! When he was arrested and this writing came to an end was when the goodbye started to truly hit home for us.

To briefly summarize, these offenses were shockingly out of character and a true heartbreak to everyone who knew him during his years in Littleton, CO. As much as I can put together of the situation, James was in a time of life when he needed stability in his relationships to support him as he aged, and would have benefited from seeing his people flourish in the beautiful church he built for them. Instead, he was uprooted and dropped in a different culture among strangers. Typically when a priest moves, their goodbyes to the former community are complete in order to give them space to bond with their new parishioners. I don't think any of his friends understood how much support he needed in his transition. He undertook his move with apparent willingness, but undoubtedly a tremendous sense of grief and loss. We all said goodbye and left him to form a new social network, a task that is incredibly challenging at an older age. I can only imagine how lonely and exhausting that transition must have seemed to him. We thought he needed us to give him space, but I think what he needed was to feel connection. I believe that pain and lack of familiar structure opened time and opportunity to allow deviant behavior to grow.

I am grateful that this terrible offense was caught and is being punished. It is better to face correction now than to let a rot persist in the soul. However I do not believe that he is without hope for a successful reentry into society. For all of the lack of awareness that his friends had regarding his need for accountability and support as he transitioned out of leadership at OLMC, now we know. Undoubtedly many will not be interested in associating with him again, but the deep ties of friendship that he formed with his closest friends will not break. We believe in forgiveness and second chances, and if given the chance to reestablish himself with those friends who have continued to write to him, he will have a community to provide more accountability, encourage reform, and help him resume his writing and study. I hope that he will be able to continue to write, and perhaps having trudged the depths of loss as he is experiencing now, his wisdom and insight will be more powerful than before. I would like to see him write again, and I hope that his life will not forever be without beauty.

Statement of Support on behalf of James W. Jackson by Lisa Smith pg. 2 Of 2

Your Honor,

My name is Susan Jane Jackson Whitfield, and I am the sister of James Ward Jackson. I understand my brother recently pleaded guilty to certain offenses in the U.S. District Court for the District of Rhode Island and will soon be sentenced. I offer this statement for the Court's consideration for sentencing purposes.

I live in Leawood, Kansas, with my husband Steven. Upon graduating in 1973 from the University of Kansas, I began teaching English in Topeka, Kansas, and then moved to Kansas City to teach for the Shawnee Mission District in 1976. After completing my Masters in English Education, I became head of the English Department of Shawnee Mission East High School and then took early retirement and began teaching AP English Language and Creative Writing at Blue Valley North High School in 2005. In 2016, my school nominated me for outstanding Kansas Teacher of the Year. I then retired again in 2017 after forty-four years in the classroom.

Although I miss my career very much, I am still tutoring juniors and seniors, especially in writing application essays to colleges. I also do freelance writing for the Kansas City Magazine, am on the board for Life Unlimited (a program for disabled adults), am a member of the Cottonwood Falls, Kansas, Chamber of Commerce, and volunteer with Daughters of the American Revolution. My husband retired from private practice in Cardiology to finish his career with the Kansas City Veterans Administration and is currently working part time for the V.A. in telemedicine. I have two sons: John, 42, is an artist in Kansas City, and Jim, 36, is a promotions manager for Fox News in Washington, D.C.

Until June of this year, I would have said that my brother and I were blessed with the perfect childhood. My father was a PhD. chemist who began working with Dupont after serving in WWII, and my mother was a homemaker who became a certified antiques appraiser. I was born in Wilmington, Delaware in 1951, and my brother was born in 1955. I thought my parents had brought him home from the hospital just for me.

After moving from Wilmington to Kansas City for my father's new job with Butler Manufacturing, we lived in a modest suburb called Prairie Village and attended public school. Our lives were centered on family and friends—our parents loved us unconditionally yet also held us accountable to help maintain the home, go to church on Sunday, and make school a priority. We took long family vacations to the West, camping, hiking, fishing, skiing, and exploring the beauty of our country in a 1956 Dodge. My brother and I have wonderful memories of those times.

The two of us have always shared many interests. We were both in Scouting, although he participated much longer than I did. We played sports, although he was a gifted athlete and I was merely enthusiastic, and we were in the advanced classes in school. However, in late grade school, Jim began to struggle with grades. I couldn't understand this because he is much more intelligent than I am.

His struggles persisted into junior high and became worse in high school. I saw a continual defiance that I thought at first was the result of typical teenage-boy rebellion, but eventually I decided his poor behavior was the result of his drug and alcohol use. At the same time, however, he was still my loving, kind, funny, wonderful brother—he had good friends and was extremely popular, especially with girls. Although we were raised to be "good" kids, I found out while I was in college that he had become sexually active very early, I believe at thirteen. During my junior year, I came home one weekend and

was utterly devastated to find out that he had taken LSD laced with strychnine and was recovering at KU Medical Center. I couldn't reconcile my understanding of who I thought he was and who he had become.

College was a time of even more difficulty for my brother, and his grades were abysmal. This was devastating to my parents because they always prioritized academics and my father had become a professor at UMKC. By the fall of 1973, I had graduated, gotten married, moved to Topeka, and started teaching. However, Jim seemed to have absolutely no idea what he wanted to do with his life. He could have had a soccer scholarship, but he seemed uninterested in much of anything except the wild partying that was unfortunately part of the college scene in the '70s. My life was very busy, so we didn't see each other often, but I knew how worried my parents were. Therefore, I was relieved when he told me he had found the perfect course of studies at KU called the Pearson Program.

In retrospect, what seemed to be such a wonderful option for him may not have been completely beneficial. The two professors in charge of the program were devout Catholics who taught classic courses in history, philosophy, literature, and other arts, all heavily influenced by religion. When students in the program began to convert to Catholicism, even becoming monks, nuns, and priests, the University shut the Pearson Program down, largely because of parent outrage.

My brother, though, was excelling academically and no longer partying. Such a relief! But then he converted to Catholicism, which was a shock to us. We were Protestant, and he had never seemed to be particularly devout. We were even more shocked when he decided to become a priest. My father was an only son, and Jim is his only son. This was an extremely painful time for our family. I always wondered if the Pearson Program was a cult my brother had joined— gathering in the lost souls, so to speak. He was happy, but at what cost?

The next years for him consisted of time in seminary and then a series of assignments in many different parishes. He eventually became a member of the Priestly Fraternity of St. Peter, which is an extremely traditional order of the Catholic Church. He served as head of the Fraternity's seminary in Denton, Nebraska, before moving to Littleton, Colorado, for twelve years until he was transferred to Rhode Island.

My brother always seemed to have joy in dedicating his life to his faith. His sacrificing a family of his own was still hard to accept. However, when he would come home to visit, he was a joy to us all. We knew how much he was admired—people had named their sons for him and several told us he had saved their lives. Literally. He thought nothing of driving miles in the middle of the night to give last rites to the dying, even when they were not members of his parish. His sacrifice continued when he became a Navy chaplain in the First Gulf War. He felt it was an honor to be able to serve his country. We were happy that he still made time for hiking, camping, fishing, and skiing, and were so proud when he published his first book.

When my father died, Jim was an invaluable support to my mother and me. And when my mother died, I know his grief nearly overwhelmed him, but he was a rock for me and my sons. The boys have always adored him, and he them. The only complaint they would make was that he was never home enough. I was very worried when he was diagnosed with an acoustic neuroma in his brain and also with rheumatoid arthritis, but he managed to carry on with his very rigorous schedule in spite of both.

I have mentioned that until June, I'd thought we'd had the perfect childhood. When I visited him at the Wyatt Detention Facility that month, he told me that he had been abused by an older woman. The abuse began when he was ten. My grief, horror, and rage cannot be expressed. That he kept this a secret for all those years did not surprise me because I have read extensively about childhood sexual abuse. Victims rarely if ever tell anyone about the abuse, and certainly not in the '60s. I also believe he was terrified about what our father might have done if he'd found out.

Recently, I have started to understand certain things now that were incomprehensible before. Why the drug use and sexual wildness in junior high, high school, and college? I believe they are the result of the anger, shame, and pain he suffered because he had been abused, and which he had tried to conceal for so long. He once told me that he was so lost at one point that he had decided to either enlist in the Marine Corps or kill himself—I have wondered if his LSD overdose was an attempted suicide.

Why celibacy? He had always dated extensively, and one girl in particular seemed to be the perfect girl for him to marry. However, he said once he didn't think he could ever love any woman. For a victim of an older woman's abuse, the priesthood must have seemed the perfect answer for why he would never marry. Yet it also cut him off from the intimacy that marriage provides. He, like other priests, has been alone for many years.

Why such a rigid priestly order? The Fraternity mandates a most rigorous priestly life. This must appeal to him because of the chaos and disorder in his life as the victim of child sexual abuse. I believe he was also attracted to the military because of its regimentation.

Why had he had mentioned more than once to my mother and me that he was "sinful"? We thought he was referring to his youthful misbehaviors. Now I think he must have been referring to his addiction to child pornography. Yet whom could he tell? In this country, use of internet pornography must be reported to the authorities. How could he get help? And what would be the consequences to his Fraternity? The Catholic Church has had countless cases of abuse to deal with. My brother, one of their most outstanding priests, a user of child pornography? Unthinkable.

Jim is my only sibling, and we are the last of our immediate family. For a long time after his first arrest, I simply could not believe he was guilty—that somehow, someone else had used his computer. I flew to Rhode Island as soon as I could to help drive him to our home in Kansas City where I thought he would be safe until he could be exonerated. To learn he had admitted his guilt nearly broke my heart.

When I tried to reconcile my love, admiration, and respect for my brother and the incredible gifts he has given to his family, his friends, his parishioners, and his Church with this admission of guilt, I found it impossible. Until I learned about what had happened to him when he was a child.

The horror of his addiction he kept secret, just as he had kept secret the horror of being abused. My researching of child pornography addiction suggests that sexually abused children can more easily become addicted to child pornography as adults. However, his life as a priest has been one of constant sacrifice and generosity. In all these years, there has never been a single instance of his being guilty of misconduct with any child.

When he is laicized, he will feel the same agony as I would feel if I were to lose my husband, my children, and my career. I mourn for him. We have always loved each other deeply, and I know that we must be parted for the term of his imprisonment. Yet I ask the Court to consider all the years of his

service to others when determining his sentence. He one of the most compassionate, intelligent, hard-working, and self-sacrificing people I have ever known. You will have received letters from other people who will tell you this as well.

It's difficult for me to look too far ahead now to imagine his future. Because he is a gifted writer, he may be able to write other books—possibly ones that might help anyone in circumstances such as his. Whatever he does, it will be something in service to others. He told me once that he would like to live out his life in a monastery in Oklahoma, which is relatively close to me. I would like to be with him as often as possible.

Sometimes I've wondered what his life would have been had he not suffered that abuse. With all his ability and his many talents, possibly a professor like our father? I try not to think too much about what might have been. But I know that his dedicating years of his life to helping families in crisis, counseling children in desperate circumstances, comforting the wounded at the hospital in Bahrain, easing the agony of the dying, and helping those who had lost all hope and faith and then found it again because of him, has made a difference in this world.

I thank the Court for considering, in spite of his guilt, what a good man James Ward Jackson is and has always been.

Sincerely,

Susie Whitfield